**Richard R. Best**
**Sanjay Wadhwa**
**Sheldon L. Pollock**
**Daniel Michael**
**Osman Nawaz**
**Philip A. Fortino**
**Lindsay S. Moilanen**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-1014 (Fortino)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>　　　　　　　**Plaintiff,**<br><br>　　-against-<br><br>**MARTIN SILVER,**<br><br>　　　　　　　**Defendant.** | 21 Civ. _____<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendant Martin Silver ("Silver" or "Defendant"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.　　This civil action concerns a string of frauds by Silver and others to cover up tens of millions of dollars in losses on bad bets in order to keep his investment advisory business, the International Investment Group LLC ("IIG"), afloat.

2.　　Until recently, IIG was an investment adviser that specialized in trade finance lending—risky loans to small- and medium-sized companies in emerging markets.  IIG and Silver, IIG's chief operating officer, served as the investment adviser to several private

investment funds—the Trade Opportunities Fund ("TOF"), the Global Trade Finance Fund ("GTFF"), and the Structured Trade Finance Fund ("STFF") (collectively, the "Private Funds")—and in that capacity, selected and managed the Private Funds' investments, principally in trade finance loans.

3. Beginning in or about 2007,[1] Silver and others at IIG engaged in a practice of hiding losses in the TOF portfolio by overvaluing troubled loans and replacing defaulted loans with fake "performing" loan assets.

4. When it was necessary to create liquidity, including to meet redemption requests, IIG sold overvalued and/or fictitious loans to new investors, including, ultimately, to GTFF and STFF, and used the proceeds to generate the necessary liquidity required to pay off earlier investors.

5. Through the conduct alleged herein, Silver is liable for violating Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; and Section 17(a) of the Securities Act of 1933 ("Securities Act").

6. The relief sought in this action is necessary to, among other things, restrain and enjoin Defendant from violating the federal securities laws.

## JURISDICTION AND VENUE

7. The Commission brings this action pursuant to authority conferred by Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and seeks to

---

[1] Silver has agreed to toll the statute of limitations for the period of September 28, 2018 to May 31, 2021. The Commission is seeking relief only for the violations by Silver alleged herein occurring after September 28, 2013.

restrain and permanently enjoin Defendant from engaging in the acts, practices, transactions, and courses of business alleged herein, and such other and further relief as the Court may deem just and appropriate.

8.  The Commission also seeks a final judgment ordering Defendant to: (a) disgorge his ill-gotten gains, together with prejudgment interest thereon, and (b) pay civil monetary penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

9.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)], Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.  Venue is proper in this District pursuant to Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)] because many of the acts and transactions constituting violations of the Advisers Act occurred within the Southern District of New York. Venue also is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the acts and transactions constituting violations alleged in this Complaint occurred within the Southern District of New York. Specifically, IIG's offices were located in the District and Silver regularly worked out of those offices and engaged in the fraudulent conduct below while in those offices.

11.  In connection with the conduct alleged in this Complaint, Defendant, directly or indirectly, made use of the means or instrumentalities of transportation or communication in, and the means or instrumentalities of, interstate commerce.

**DEFENDANT**

12.     Silver is age 63 and resides in Long Branch, New Jersey.

13.     During all relevant times, Silver was a co-founder, a managing partner, and chief operating officer of IIG, as well as a 50 percent owner of the firm. From time to time, Silver also served as IIG's chief financial officer.

14.     Silver previously held a Series 7 securities license and was a registered representative associated with the broker-dealer IIG Horizons Securities, LLC from May 1997 to February 2012.

**FACTS**

**Background on the Private Funds and Trade Finance Loans**

15.     From its inception in 1994 until November 2019, when its registration as an investment adviser was revoked by the Commission,[2] IIG specialized in advising clients with respect to investments in emerging market economies. In or about 1998, it launched TOF. IIG launched GTFF and STFF in June and July 2017, respectively. All three Private Funds had the stated strategy of investing in trade finance loans.

16.     Trade finance loans are loans made to small- to medium-sized businesses, usually commodities exporters located in emerging markets, such as Latin America. The loans are typically risky investments because the borrower's ability to repay could be impacted by less stable regulatory and economic conditions in the borrower's home country. In order to mitigate

---

[2]     In November 2019, IIG consented to the entry of a partial judgment in *SEC v. International Investment Group LLC*, No. 19 Civ. 10796 (S.D.N.Y.) (DLC), which, among other things, enjoined it from violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and (2) of the Advisers Act. IIG also contemporaneously consented to a Commission order revoking its registration on the basis of the injunction. On March 30, 2020, the Court entered a final judgment against IIG on consent, ordering it to pay over $35 million in disgorgement and prejudgment interest.

4

the risk of these investments, trade finance loans typically are secured by collateral, which may include one or more of receivables, inventories, and assets.

17. All three of the Private Funds were marketed to qualified institutional investors, including pension funds, insurers, and hedge funds, as a way for these prospective investors to diversify their portfolios with exposure to trade finance loans in Latin America.

18. In offering memoranda and other communications, IIG touted its risk control strategies, which included portfolio concentration limits at the borrower, country, and commodity level.  It also touted its robust credit review process for borrowers.

19. IIG prepared valuations of the Private Funds on a regular basis including through a determination of the funds' net asset values ("NAV"), and IIG received compensation based on the NAV and performance calculations.  Silver's personal compensation came out of the fees IIG collected.  IIG virtually always valued every trade finance loan in the Private Fund portfolios at par plus accrued interest throughout the entire life of the funds.

### Silver and IIG Hide Losses in TOF

20. Beginning in or about 2007, Silver, with others, engaged in various deceptive acts to misrepresent the performance of and conceal losses in TOF, including overvaluing portfolio assets and replacing non-performing assets with fictitious loans that were reported as if they were legitimate performing assets.

21. In or about 2007, when TOF's gross asset value was approximately $300 million, IIG learned that a South American coffee producer had defaulted on a $30 million loan (the "Coffee Loan") by TOF.

22. Fearing that existing investors would flee the fund and that ongoing fundraising efforts would suffer if the loss were disclosed, IIG's two co-owners, Silver and David Hu

("Hu")[3], decided to conceal the loss by incorrectly valuing the loan at par plus accrued interest on TOF's books.

23. The overvaluation of the Coffee Loan materially inflated the NAV reported to TOF investors.

24. When it became untenable to continue to carry the Coffee Loan on TOF's books as a performing asset due to auditor scrutiny, Hu and Silver removed the Coffee Loan from the firm's books and replaced it with fake loans to different borrowers (each, a "Substitute Loan"). The purported borrowers of the fake Substitute Loans were foreign companies, controlled by a business associate of IIG, that purportedly were operating in other industries. Accordingly, the purported borrowers never received anything of value from TOF, and there was no expectation they ever would make any payments to TOF.

25. Hu and Silver directed that documentation be created to evidence each Substitute Loan for audit purposes. In addition, starting in about 2010, Hu and Silver arranged for the purported borrowers to provide confirmations of the fake debts to auditors. In one case, Silver arranged for TOF to pay a monthly fee to a purported borrower in exchange for receiving such false confirmations.

26. In or about 2010, a seafood producer defaulted on another sizeable TOF loan of approximately $30 million to (the "Seafood Loan"). As in the case of the loss on the Coffee Loan, Hu and Silver agreed to hide the new loss by first continuing to value the Seafood Loan at

---

[3] In February 2021, Hu consented to the entry of a partial judgment in *SEC v. Hu*, No. 20 Civ. 5496 (S.D.N.Y.) (DLC), which, among other things, enjoined him from violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and (2) of the Advisers Act. The Commission contemporaneously barred Hu from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization.

par plus accrued interest and, when that became untenable, then removing the Seafood Loan from the portfolio and replacing it with additional Substitute Loans.

27. Over time, as new losses arose or as the fictitious loans matured, Hu and Silver would remove them from the TOF portfolio and replace them with additional Substitute Loans.

28. Hu and Silver's practice of overvaluing loans, including valuing the worthless Substitute Loans in the tens of millions of dollars, artificially inflated TOF's NAV and resulted in IIG receiving management and performance fees to which it was not entitled.  As a co-owner of IIG, Silver received distributions of a portion of these excess fees.

### IIG Defrauds New Investors to Keep TOF's Losses Under Wraps

29. In or about November 2013, TOF continued to have liquidity problems due to investor redemption requests, as well as repayment obligations on loans the fund had taken from international development banks.

30. In order to help meet these liquidity needs, Silver spearheaded an effort to securitize the TOF loan portfolio.

31. Ultimately, as a result of Silver's efforts, IIG obtained bank financing of approximately $220 million to capitalize a collateralized loan obligation trust (the "CLO").

32. IIG, which served as the investment adviser to the CLO, then caused the CLO to use some of its capital to acquire existing trade finance loans from TOF.  The CLO retained additional capital to make new trade finance loans.

33. Once it had acquired these assets from TOF, the CLO issued bonds to investors, backed by the cash flows the CLO received from the trust's assets.

34. The proceeds to TOF from the sale of these loans to the CLO were not sufficient to meet TOF's liquidity needs.

35. Beginning in late 2014 and continuing through at least September 2016, in order to generate more liquidity, Hu diverted some of the remaining cash from the CLO to TOF.

36. To disguise the transactions, Hu caused the CLO to make new loans to at least seven Panamanian shell companies (the "Panama Loans") secretly owned by IIG, but instead of directing the money to the supposed borrowers, Hu directed that it be transferred to a TOF account and used to pay TOF's liabilities.

37. Hu, with the assistance of a senior IIG employee ("Employee-1"), acquired the shell companies that were the nominal borrowers on the Panama Loans and procured fraudulent promissory notes memorializing the Panama Loans.

38. The Panama Loans were worthless. And, Silver ultimately learned that the CLO had received no payments on any of the Panama Loans.

39. Nonetheless, IIG valued the fake assets in the tens of millions of dollars on the books of the CLO.

**IIG Offloads the Fake and Troubled Loans to New Clients**

40. In or about 2017, TOF's liquidity needs persisted, and the notes issued by the CLO began to mature, without sufficient cash in the CLO from interest and principal payments to redeem all the noteholders.

41. Hu and Silver explored various options to generate liquidity to meet the liabilities of TOF and the CLO, including forming a new fund to purchase assets from each.

42. In or about 2017, IIG succeeded in generating interest in a new private fund, GTFF, on the part of a foreign investor ("Investor-1"), which agreed to invest $70 million as an anchor investor in the new fund.

43. At Hu's direction, IIG used Investor-1's investment and subsequent smaller investments by two other foreign investors to purchase loan assets from TOF and the CLO for the GTFF portfolio. The assets purchased included approximately $44 million in fake Substitute Loans and Panama Loans.

44. In connection with the transfer of the Panama Loans to GTFF and STFF, IIG's staff sent emails to Silver, alerting him to discrepancies in the documentation of the loans and to the fact that many of the loans were missing the original collateral documents.

45. Silver, who also ultimately had become aware that IIG had received no payments on any of the Panama Loans, did not ensure that the issues with the loans were remedied.

46. In addition, Hu caused GTFF to purchase approximately $28 million in loans (the "Argentina Loans") to an Argentine borrower (the "Argentine Borrower") from the CLO. At the time of the transaction, IIG had received notice that the Argentina Loans were disputed, with the borrower claiming that the loans had been fully satisfied and IIG claiming the Argentine Borrower was in default. Hu failed to disclose the dispute concerning the Argentina Loans to GTFF and caused the fund to purchase the loans at par plus accrued interest, a price materially higher than the actual value of the assets in light of the claimed payoff and default.

47. Around the same time, Investor-1 asked IIG to create another fund, STFF, to facilitate an additional $130 million investment.

48. IIG still was in need of fresh capital to fully redeem the CLO noteholders and bail out TOF and agreed to establish STFF to facilitate Investor-1's additional investment.

49. Hu then caused STFF to acquire approximately $10 million in fake Substitute Loans and Panama Loans from TOF and the CLO.

50.     In addition, Hu caused STFF to acquire $25 million in disputed Argentina Loans from the CLO.  As in the case of the GTFF transactions, Hu caused STFF to pay full price for the Argentina Loans and did not inform STFF or Investor-1 that the loans were disputed.

51.     The sale of the fake loans and over-valued Argentina Loans to GTFF and STFF operated as a fraud on those funds and resulted in substantial financial damage to those clients.

52.     Silver prepared and provided reports and information to the investors and GTFF and STFF that represented the assets as fairly valued legitimate assets.  He had become aware that the Argentina Loans were disputed and therefore was at least reckless in not recognizing that the Argentina Loans were disputed and worth less than the reporting suggested.  Silver also was at least reckless in failing to recognize that the Panama Loans were fake assets, insofar as he had been put on notice that necessary records for the loans were missing and that no payments had been made on the loans.

## FIRST CLAIM FOR RELIEF

### Sections 206(1) and (2) of the Advisers Act

53.     The Commission realleges paragraphs 1 through 52, above.

54.     Silver, who had an adviser-client relationship with, and therefore owed a fiduciary duty to, the Private Funds, violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S. Code § 80b-6(1), (2)].

55.     From at least September 2013 to the present, while acting as an investment adviser, Defendant, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, (a) employed a device, scheme, or artifice to defraud a client or prospective client; and/or (b) engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon a client or prospective client.

56. Specifically, Silver knowingly reported false valuations of the Substitute Loans to investors in TOF, resulting in the firm paying higher fees to IIG and ultimately Silver than it should have.

57. In addition, Silver knew, or recklessly disregarded the risk that, certain of the loan participations IIG sold to the CLO and later to GTFF and STFF were over-valued or fraudulent, and reported or allowed those assets to be reported to investors as legitimate, fairly valued assets.

## SECOND CLAIM FOR RELIEF

### Section 10(b) of the Exchange Act and Rules 10b-5(a), (b), and (c) Thereunder

58. The Commission realleges paragraphs 1 through 52, above.

59. Silver violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

60. From at least September 2013 to the present, Defendant, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operates or would operate as a fraud or deceit upon any person.

61. Specifically, Silver knew, or recklessly disregarded the risk that, certain of the loan participations IIG sold to GTFF and STFF were over-valued or fraudulent, but reported those assets to be reported to investors as legitimate, fairly valued assets.

## THIRD CLAIM FOR RELIEF

### Sections 17(a)(1), (2), and (3) of the Securities Act

62.   The Commission realleges paragraphs 1 through 52, above.

63.   Silver violated Section 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)].

64.   From at least September 2013 to the present, Defendant, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the offer or sale of securities, and with knowledge, recklessness, or negligence, (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of the securities being offered or sold.

65.   Specifically, Silver knew, or recklessly disregarded the risk that, certain of the loan participations IIG sold to GTFF and STFF were over-valued or fraudulent, but reported those assets to be reported to investors as legitimate, fairly valued assets.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court grant the following relief:

### I.

A final judgment permanently restraining and enjoining Defendant from directly or indirectly committing future violations of Section 206 of the Advisers Act [15 U.S.C. § 80b-6],

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

**II.**

A final judgment ordering Defendant to disgorge all ill-gotten gains or unjust enrichment, plus prejudgment interest thereon;

**III.**

A final judgment ordering Defendant to pay civil monetary penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

**IV.**

Granting such other and further relief as the Court deems just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated: New York, New York
April 13, 2021

Respectfully submitted,

By: /s/ Daniel Michael
Richard R. Best
Sanjay Wadhwa
Sheldon Pollock
Daniel Michael
Osman Nawaz
Philip A. Fortino
Lindsay S. Moilanen
SECURITIES AND EXCHANGE
 COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-1014 (Fortino)